IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2007 AUG 22 P 3: 54

CLERK_____
CV 106-66 DIST. OF GA.

LORI MYLES,                    *
                               *
                               *
        Plaintiff,             *
                               *
           vs.                 *
                               *
RICHMOND COUNTY BOARD          *
OF EDUCATION, and              *
DR. CHARLES LARKE              *
individually and in his        *
official capacity              *
as Superintendent of the       *
Richmond County Public         *
Schools District,              *
                               *
        Defendants.            *

———————————

O R D E R

Before the Court in the captioned case is Defendants'
motion for summary judgment (doc. no. 18) on all of Plaintiff's
claims. Upon consideration of the briefs submitted by counsel,
oral argument on May 9, 2007, and the relevant law, Defendants'
motion is **GRANTED** as to all Federal claims.

I. BACKGROUND

Plaintiff began her employment with the Richmond County
Public School system in 1987 as an English teacher at Laney
High School. (Pl.'s Dep. at 6.) In 1992 she was promoted to
Diversified Cooperative Training Coordinator. (Id.) In 1998,
she became Josey High School's Diversified Cooperative Training

1

Coordinator. (Id. at 7.) Plaintiff has remained in this position since 1998, despite her efforts for promotion.

Defendant Richmond County Board of Education ("Board") is Plaintiff's ultimate employer. The Board of Education is responsible for the control and management of the public schools in Richmond County. Defendant Dr. Charles Larke ("Larke") was the Superintendent of the public school system of Richmond County for all times relevant to this action. Larke, as superintendent, had the responsibility to recommend to the Board what persons should be hired to fill vacant administrative positions, including the positions of principal, assistant principal, and vocational supervisor. (Larke Dep. at 4-5.) The Board is responsible for approving Larke's recommendations.

Plaintiff filed this lawsuit seeking monetary damages against Defendants for retaliating against her for exercising her rights of free speech and association, and for sex discrimination. (Pl.'s St. of Cause of Action, doc. no. 43 at 4.)

A. Hiring Practices

To put Plaintiff's allegations in context, it is necessary to summarize the hiring procedure for the school system. Initially, it should be noted that there is no specific hiring procedure required by Georgia law.[1] However, according to

---

[1] The sole requirement under Georgia law is that all hiring and promotion decisions in a public school system are made by the Board of Education upon the recommendation of the Superintendent. O.C.G.A. § 20-2-211.

Marion Barnes, former President of the Board, the Board officially adopted the following procedure to fill vacant administrative positions. First, vacant positions are advertised, and interested candidates submit an application. (Barnes Dep. at 7.) If the candidates meet the minimum qualifications listed in the job posting, a screening panel interviews them. Dr. Missoura Ashe ("Dr. Ashe"), Assistant Superintendent for Administrative Services of the school system, selects the members of the screening panel. Screening panel members confidentially score each individual applicant based upon their qualifications and performance in the interviews.[2] (Ashe Dep. at 7, 147; Larke Dep. at 10, 14.) After scoring the candidates, the screening panel ranks them and makes a recommendation to the Superintendent. The Superintendent then makes a recommendation to the Board. Lastly, the Board holds a vote based on the recommendation of the Superintendent. (Barnes Dep. at 7.)

According to Plaintiff, the hiring process practiced by the school system deviated from this screening procedure. In fact, Larke admits that sometimes candidates who did not receive the highest score got his recommendation. (Larke Dep. at 11-12.) Both Larke and Dr. Ashe testified that the screening process is designed only to identify a "pool" of the best-

---

[2] Applicants who have recently gone through the screening interviews may elect to use their previous scores in a subsequent application. (Ashe Dep. at 38.)

qualified candidates. (<u>Id.</u> at 71; Ashe Dep. at 147.) Thus, promotions are not necessarily awarded to the candidates with the highest screening score.

For example, for the position of assistant principal, Dr. Ashe takes the list of top candidates, as ranked by the screening committee, to the principal of the school where the vacant position exists. (Ashe Dep. at 59.) The principal interviews those applicants and makes a recommendation to Dr. Ashe. (<u>Id.</u> at 60.) Dr. Ashe then informs Larke of the principal's recommendation. (<u>Id.</u>) Larke stated that he "would never recommend somebody for an assistant principal [who] the principal did not feel comfortable with." (Larke Dep. at 68.) The process of obtaining input from school principals regarding the selection and placement of assistant principals is sanctioned by the entity charged with the responsibility of school accreditation, the Southern Association of Colleges and Schools. (Barnes Dep. at 62-63.)

According to Plaintiff, Larke recommended unqualified individuals for promotions. For example, a vacancy for the position of Vocational Supervisor became available for the 2001-02 school year.[3] (Ashe Dep., Ex. 8.) Plaintiff and nine others applied for the position and were interviewed by the screening committee. (<u>Id.</u>) The successful applicant, M. Nanette Barnes ("Barnes"), was promoted despite the screening committee

---

[3] Of note, the positions of vocational supervisor and assistant principal are equivalent; Richmond County administrators use the terms interchangeably. (Larke Dep. at 4-5.)

AO 72A
(Rev. 8/82)

ranking her sixth out of ten applicants.[4] (Id.) Barnes is the daughter of former school board member Marion Barnes. (Barnes Dep. at 55.) According to Plaintiff, at the time of her promotion to Vocational Supervisor in 2001, Barnes lacked a leadership certification, which is a required credential for the position.[5] (Pl.'s Resp. to Defs.' St. of Mat. Facts, Ex. 7.)

B. Plaintiff Speaks Out

In 2001, Plaintiff began to voice her concerns about the hiring practices of the school system. In fact, Plaintiff spoke out on numerous occasions over the span of several years. The record shows that the majority of Plaintiff's complaints pertain to her own inability to receive a promotion. (See, e.g., Pl.'s Dep., Ex. 14.) Of particular importance, during an extensive, exhaustive exchange in deposition, Plaintiff swears under oath that while she complained about the unfair hiring practices, she had a personal interest in almost every position about which she complained. (See generally id. at 240-79.) For example, Plaintiff testified regarding the content of her conversation with the principal of Josey, Quentin Motley:

---

[4] Plaintiff ranked ninth of the ten candidates who participated in the screening process. (Pl.'s Dep., Ex. 2.)

[5] In the instant lawsuit, Plaintiff identifies other instances in which she contends that proper procedure was not followed. For example, in April 2003, the Board advertised a vacancy for the position of Vocational Supervisor. (Ashe Dep., Ex. 3.) Plaintiff was not granted an interview. Patricia Jefferson, the wife of then Board member Andrew Jefferson, was promoted despite the screening committee ranking her seventh out of eleven persons interviewed. (Pl.'s Resp. to Defs.' St. of Mat. Facts, Ex. 1.) Moreover, Jefferson was permitted to remain in the position of Vocational Supervisor for two years without obtaining the required leadership certification for the position. (Ashe Dep., Ex. 15.)

Q: Just tell me what you told Mr. Motley.

A: About the unfair hiring practices and that I would pursue legal action.

Q: And you told them that you should have received positions that were awarded to others, that the people who received the positions were not certified and you were, that you were better qualified than they were, and that you felt you had been treated unfairly, and that you would get legal representation, correct?

A: Yes.

Q: Did you tell them anything else other than that?

A: No.

Q: And the reason you told them that is because you were unsatisfied with the hiring practices?

A: Correct.

Q: Because you had not received positions that you felt you were entitled to, correct?

A: Correct.

(Id. at 259-60.)

Around March of 2004, Plaintiff verbally discussed her concerns with Board members Barbara Padgett, Y.N. Myers, Ken Echols, and J.R. Hatney. Plaintiff told these board members that she should have received some of the positions that were awarded to others, and that the individuals who were promoted were not as qualified as she was. (See id. at 257-59.)

In addition to contacting Board members, Plaintiff also spoke to local representatives of the Georgia Association of Educators ("GAE") about her grievances in failing to be promoted. (Id. at 252-54, 262-63.) Specifically, Plaintiff

testified as follows:

> Q: And did you speak with someone at GAE in 2003
> because you had a grievance with the County?
>
> A: Yes.
>
> Q: And the reason you had a grievance was because you
> felt you should have received promotions that others
> received?
>
> A: No, on the basis of all unfair hiring practices,
> the vocational supervisors as well as the assistant
> principal positions.
>
> Q: These were all positions that you applied for and
> did not receive?
>
> A: (Witness nods head affirmatively.)
>
> Q: Is that correct?
>
> A: Correct.

(Id. at 252-53.) Finally, Plaintiff filed an ethics complaint against Larke with the Georgia Professional Standards Commission ("PSC"). In her complaint, Plaintiff expressed her concerns regarding the unfair hiring practices.[6] (Id., Ex. 22.) Of note, Plaintiff admits she never addressed the Board during any public comment sessions to complain about the employment practices or personnel decisions of Larke or the Board, nor did she ever lodge a formal employee complaint with the school system. (Pl.'s Resp. to Defs.' St. of Mat. Facts, ¶¶ 60-62, 74.)

In May of 2004, Plaintiff met with Larke, Barnes, Dr. Ashe, Quentin Motley, and Jackie Young, the Director of

---

[6] Plaintiff asserts that she called Larke's office on two separate occasions to inform him of her intentions to make a formal complaint. Plaintiff claims she left a message on the answering machine of his secretary. (Pl.'s Dep. at 263-66.)

AO 72A
(Rev. 8/82)

Vocational Education. (Pl.'s Dep. at 95-97.) During the meeting, those present discussed a multitude of issues, including: Motley's request that Plaintiff be transferred to another school, a dispute concerning Plaintiff's daughter not receiving honor cords for her graduation from Josey High School, and paperwork not being forwarded to Emory University that would have enabled Plaintiff's daughter to receive a college scholarship. (Id. at 96.) At the conclusion of the meeting, Larke, Dr. Ashe, and Plaintiff stayed and discussed the hiring process and Plaintiff's contentions that it was unfair. When Plaintiff expressed concern about her inability to obtain a promotion, Larke told her to continue pursuing higher education. Larke also suggested that she talk to people on the screening panel to learn how to improve performance during the screening process. (Larke Dep. at 113-14; Ashe Dep. at 169-72.)

Plaintiff voiced her concern to Larke that individuals were being promoted based upon nepotism and cronyism. (Pl.'s Dep. at 108.) According to Plaintiff, Larke dismissed her complaints saying "you will never get a position in this county if you don't be quiet and if you don't stop calling Board members." (Id.) Next, Plaintiff alleges Larke pulled out pictures of Plaintiff's classroom in disarray and mentioned the ethics complaint that she filed against him with the PSC. (Id., Ex. 19.) Larke allegedly ended his discussion with Plaintiff by stating, "I can do what I want to do and there's nothing anybody can say about it." (Id. at 111.) Both Larke and Dr.

AO 72A
(Rev. 8/82)

Ashe's recollection of the meeting is contrary to Plaintiff's allegations. Specifically, neither recall Larke ever threatening Plaintiff. (Larke Dep. at 113; Ashe Dep. at 169-72.) In addition, Defendants allege that neither Larke nor Dr. Ashe were even aware of Plaintiff's complaint with the PSC prior to this lawsuit. (Larke Dep. at 60, 113-15, 134; Ashe Dep. at 144-45, 158-60, 169-72.)

In addition to the denial of promotions, Plaintiff alleges she was retaliated against because she began to experience problems in receiving her compensation under the extended day program. (Id., Ex. 26.) Payments were supposed to begin in September 2004; however, Plaintiff did not receive her compensation for that program until several months later.[7] (Id. at 81.) Plaintiff also alleges her reimbursement for work-related expenses was delayed. Here, Dr. Ashe testified that Larke does not handle employee reimbursements of this nature.[8] (Ashe Dep. at 160-61.)

With regard to the failure of her daughter to receive a scholarship to Emory University, the evidentiary record shows that Plaintiff failed to submit application forms in a timely manner. (Pl.'s Dep. at 97-98, 102-103, Ex. 12.) Further, the

---

[7] Larke, however, testified that he took no action to delay her extended-day pay, and even interceded in an effort to have her pay corrected. (Larke Dep. at 140-42.)

[8] Moreover, Plaintiff concedes she has no knowledge regarding whether her reimbursement forms were submitted to Larke in a timely manner. (Pl.'s Dep. at 91-93). Ultimately, Dr. Ashe testified that the alleged delay was due to Plaintiff's failure to timely submit the required documentation. (Ashe Dep. at 160-61.)

record shows that Larke does not get involved with students'
applications for scholarships. (Larke Dep. at 142; Pl.'s Dep.
at 97-103.)

## C. Larke Fails to Recommend Plaintiff

Around August of 2005, the position of Vocational
Supervisor became available at Josey High School. (Ashe Dep.,
Ex. 2.) According to the schedule for screening committee
interviews, Plaintiff and six other candidates interviewed for
the position. (Id. Ex. 5.) No interview time is listed for
Barbara DeGatis. (Id.) However, Dr. Ashe called DeGatis to
inform her of the position, despite the fact that DeGatis had
not applied. (DeGatis Dep. at 25-26.) As a result, DeGatis
elected to use her previous scores from a similar screening
interview.[9] (Ashe Dep., Exs. 5-6.) According to Plaintiff,
DeGatis was given special consideration for the position. In
fact, Plaintiff claims Larke did not follow his own hiring
protocol. In this case, Quentin Motley did not make DeGatis his
first or second choice to fill the vacant position, yet Larke
recommended her for the position. (Ashe Dep., Ex. 4; Larke Dep.
at 68.)

Plaintiff also claims there was prejudice on the screening
committee against her during her interview process. In fact,
Plaintiff claims she was intentionally scored lower because she
had spoken out to Board members about the hiring practices of
the school system. Defendants, on the other hand, offer

---

[9] Of note, Plaintiff ranked below DeGatis. (Ashe Dep., Ex. 6.)

AO 72A
(Rev. 8/82)

specific reasons for her inability to receive a promotion. For example, in 2004 Plaintiff was investigated for leaving her classroom in disarray. (Larke Dep. at 45-48.) Plaintiff also failed to turn in her work laptop to school officials in a timely manner. (Pl.'s Dep. at 108-09, Exs. 9, 19.) On another occasion, a student and her parent complained that Plaintiff had unjustifiably given the student a zero as a semester grade. (Id. at 208-09, Exs. 17, 18.) The principal of the school at which Plaintiff taught complained that Plaintiff "made statements against [the principal] and two of her colleagues that were untrue which can only continue to cause friction to all involved." (Id., Ex. 8.) Still, on another occasion, the principal had to call a public safety officer to remove Plaintiff from his office after she refused to leave. (Id., Ex. 10.) Ultimately, Defendants assert that Plaintiff was never in the "pool" of top ranked candidates because she was not well-qualified.

D. Jamaica Trip

Plaintiff also sets forth claims based upon allegations of sexual harassment. All of these allegations relate to a November 2000 trip to Jamaica. Horace Lamback, the principal at Plaintiff's school at the time, asked Plaintiff to accompany a group of employees for a two-day trip. The purpose of the trip was to establish a partnership between students of Jamaica and Richmond County through the use of computer technology. (Pl.'s Dep. at 50-51.) D'Andrea Jackson, Dr. Audrey Wood, and Larke,

all employees of the school system, accompanied Plaintiff and Lamback on the trip. (Id. at 36.) While there, Plaintiff shared a room with Jackson. (Id. at 38.)

According to Plaintiff, Larke made three romantic overtures toward her. The first occurred during a pre-dinner meeting with Lamback, Dr. Wood and Jackson. Larke allegedly informed Plaintiff and Jackson that the reason they were asked to come on the Jamaica trip was because they were the "most beautiful women" in the county. (Id. at 38.) Later that evening, Plaintiff and other members of the school system were at a table for dinner where a performer sang about a man, a woman, and a bamboo stick. (Id. at 42.) At the conclusion of the song, Larke allegedly made his second overture when he stated aloud that he wanted someone to "ride his bamboo stick." (Id.) According to Plaintiff, Larke looked at her when he made the comment. (Id.)

Immediately after Larke's second comment, Plaintiff left the dinner table and went to the nearby pool area. (Id. at 43.) While there, Plaintiff sat down on the edge of a lounge chair. A few moments later, Jackson and Larke joined Plaintiff. At the pool, a fashion show was taking place, and models displayed lingerie and swimsuits pool-side. Plaintiff alleges that, while sitting in the lounge chairs, Larke made his third overture when he informed her she would "look good" in some of the clothing which was modeled. Plaintiff also alleges Larke stated he would be willing to buy some of the lingerie and

AO 72A
(Rev. 8/82)

swimsuits for her. (<u>Id.</u> at 45.) Of note, Plaintiff concedes that both Lamback and Jackson were in the presence of her and Larke when all of these alleged comments were made. That said, both Lamback and Jackson have testified that Larke made no statements of a sexual or romantic nature. (Pl.'s Dep. at 38, 40-42, 45; Aff. of Lamback, ¶ 13; Aff. of Jackson, ¶¶ 4-7.)

Plaintiff concedes Larke never touched her in an inappropriate way. (<u>Id.</u> at 35-36.) In addition, Larke never called Plaintiff on the telephone at any time on the trip, and he was never alone with Plaintiff at any time on the trip. (<u>Id.</u> at 35-37, 48-49, 55.) In fact, Plaintiff never reported Larke's conduct in Jamaica to the school system pursuant to its anti-sexual harassment policy. (Pl.'s Resp. to Defs.' St. of Mat. Facts, ¶ 52.)

Nevertheless, according to Plaintiff, since the Jamaica trip she has been subjected to retaliation and denied promotions because she rejected Larke's alleged romantic overtures. In support of this notion, Plaintiff relies solely on alleged hearsay statements by Horace Lamback. (Pl.'s Dep. at 21-22.) Specifically, Plaintiff claims Lamback told her the reason she was not getting promoted was because she rejected Larke's overtures in Jamaica. (<u>Id.</u> at 22.) Lamback has sworn under oath that he never made any such statement. (Aff. of Lamback, ¶ 8.)

## II. <u>SUMMARY JUDGMENT STANDARD</u>

Rule 56(C) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate only where the moving party is entitled to judgment as a matter of law. A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). The purpose of the summary judgment rule is to dispose of unsupported claims or defenses which, as a matter of law, raise no genuine issues of material fact suitable for trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

The party who moves for summary judgment bears the initial burden "to show the district court, by reference to materials on file, that there is no genuine issue of material fact that should be decided at trial." <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991). A court must view the evidence presented in a light most favorable to the non-moving party.

However, once the moving party meets his initial burden, "the burden shift[s] to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." <u>Id.</u> at 608. The non-moving party may not rest upon mere allegations or denials in pleadings, but must set forth specific facts, through affidavits or the other forms of evidence provided for by the rules. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970). Essentially, "the inquiry . . . is . . . whether the evidence presents a sufficient

AO 72A
(Rev. 8/82)

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-52.

## III. DISCUSSION

Plaintiff contends that Defendants' actions infringed her rights of free speech and free association as protected by the First and Fourteenth Amendments to the United States Constitution and the Georgia Constitution.[10] (Compl. ¶ 23.) Plaintiff further states that Defendants retaliated against her by not promoting her, delaying her compensation for work-related reimbursement, and preventing her daughter from acquiring a scholarship. (Id. ¶ 20.) Plaintiff also alleges that because she rejected Larke's overtures, he retaliated against her by not promoting her; and these actions constituted sexual discrimination in violation of due process and equal protection. (Id. ¶ 31.)

Defendants seek summary judgment on all claims. Defendants argue: (1) claims against Defendant Larke in his official capacity should be dismissed; (2) the statute of limitations bars any § 1983 claim accruing prior to May 16, 2004; (3)

---

[10] Section 1983 provides a remedy for deprivations of federal rights. Wideman v. Shallowford Community Hosp., Inc., 826 F.2d 1030, 1032 (11th Cir. 1987). Here, Plaintiff does not set forth an independent claim under the Georgia Constitution, and her invocation of it under § 1983 is unavailing. Also, jurisdiction over such claim rests solely upon 28 U.S.C. § 1367, and the absence of a federal claim places supplemental jurisdiction in doubt. 28 U.S.C. § 1367(c)(3). Accordingly, to the extent Plaintiff alleges a state law claim, it is dismissed without prejudice. Crosby v. Paulk, 187 F.3d 1339, 1352 (11th Cir. 1999).

AO 72A
(Rev. 8/82)

Plaintiff's claims that her First Amendment right to free speech and association was violated should be dismissed because: (a) her speech is not the type afforded protection under the First Amendment, and (b) any such statements made by Plaintiff were not causally related to her failure to be promoted; and (4) Plaintiff's claims of sexual harassment based upon the Equal Protection Clause of the Fourteenth Amendment fail because Plaintiff has failed to present a prima facie case of sexual harassment.

## A. Official Capacity

Plaintiff has filed this action against Dr. Larke in both his individual capacity and his official capacity as Superintendent of the Richmond County Public Schools District. (Compl. ¶ 3.) The federal claims against Larke in his official capacity are considered the functional equivalent of claims against the governmental unit for which he is employed. See Kentucky v. Graham, 473 U.S. 159, 166 (1984) ("[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity."). Accordingly, Plaintiff's claims against Larke in his official capacity are **DISMISSED**.

## B. Statute of Limitations

Plaintiff's claims are subject to a two-year statute of limitations. See Rozar v. Mullis, 85 F.3d 556, 561 (11th Cir. 1996); Williams v. City of Atlanta, 794 F.2d 624, 626 (11th Cir. 1986).

At oral argument, Plaintiff argued that Defendants' acts constituted continuing violations and, as such, were not subject to the applicable statute of limitations for § 1983 claims. However, the Supreme Court has held that a discrete act of discrimination such as failure to promote does not constitute a continuing violation that extends the limitations period. See National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 114-15 (2002); see also EEOC v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1271-72 (11th Cir. 2002); Ledbetter v. Goodyear Tire & Rubber Co., 421 F.3d 1169, 1179-80 (11th Cir. 2005), aff'd __ U.S. __, 127 S.Ct. 2162, 2163 (2007). In this case, Plaintiff asserts a failure to promote claim as well as a quid pro quo sexual harassment claim. Notably, these claims are based on discrete acts of discrimination.[11] Thus, because this action was filed on May 16, 2006, any claim based upon any employment decision prior to May 16, 2004 is time-barred because it accrued more than two years before the suit was brought.

C. Free Speech

Plaintiff's First Amendment claim involves allegations that Defendants failed to promote her to various positions "because she spoke out and complained about their hiring practices." (Compl. ¶ 22.) Plaintiff further contends such

---

[11] Of note, a hostile work environment claim is, by its very nature, repeated conduct. Such claims are based on the cumulative effect of individual acts. Thus, a court must consider behavior outside the alleged statutory time period. See Morgan, 536 U.S. at 115. Here, Plaintiff has not alleged a hostile work environment claim. (See Pl.'s Br. Opposing Defs.' Mot. for Summ. J. at 19.)

retaliation was in violation of her First Amendment rights, citing 42 U.S.C. § 1983.

Public employers cannot retaliate against public employees for exercising their First Amendment free speech rights on matters of public concern. See, e.g., Gonzalez v. Lee County Housing Auth., 161 F.3d 1290, 1295 (11th Cir. 1998). The Supreme Court has provided the analysis applicable to claims like Plaintiff's. "In the particularized context of government employees exercising their First Amendment rights, . . . the appropriate analysis is the balancing test established in Pickering v. Board of Education of Township High School District 205, 391 U.S. 563, 88 S. Ct. 1731, 20 L.Ed.2d 811 (1968)." Thaeter v. Palm Beach County Sheriff's Office, 449 F.3d 1342, 1355 (11th Cir. 2006).

Under this test, the government employee arguing that an adverse employment decision violated her First Amendment rights must first show that the employee's speech is "fairly characterized as constituting speech on a matter of public concern." Bryson v. City of Waycross, 888 F.2d 1562, 1565 (11th Cir. 1989)(quoting Rankin v. McPherson, 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, (1987)). If it is, the Court next applies the Pickering balancing test, which weighs the employee's free speech interest against "the interest of the state, as an employer, in promoting the efficiency of the public services it performs." Pickering, 391 U.S. at 568. If the employee's interests outweigh those of the state as an employer, the Court

turns to the third prong: whether the speech "played a 'substantial part' in the government's decision to discharge the employee." <u>Fikes v. City of Daphne</u>, 79 F.3d 1079, 1084 (11th Cir. 1996). If it did, the fourth prong comes into play, which is whether the government has shown by a preponderance of the evidence that it would have made the same employment decision regardless of the protected conduct. <u>Id.</u> at 1085.

The first two steps are questions of law; the final two steps are questions of fact designed to determine whether the alleged adverse employment action was in retaliation for the protected speech. <u>Anderson v. Burke County, Ga.</u>, 239 F.3d 1216, 1219-20 (11th Cir. 2001).

1. Matter of Public Concern

Only specific types of speech receive protection under the Constitution. Namely, when a plaintiff speaks as an employee on matters of personal interest and not as a citizen upon matters of public concern, the First Amendment is not implicated. <u>Morris v. Crow</u>, 117 F.3d 449, 457 (11th Cir. 1997). Likewise, when "public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." <u>Garcetti v. Ceballos</u>, 547 U.S. __, 126 S.Ct. 1951 (2006).

The threshold question is whether Plaintiff spoke as a citizen on a matter of public concern. <u>See, e.g., Battle v. Board of Regents for Ga.</u>, 468 F.3d 755, 760 (11th Cir. 2006).

AO 72A
(Rev. 8/82)

In making its determination, the Court must look to the "content, form, and context of a given statement, as revealed by the whole record." Chesser, 248 F.3d at 1122 (citing Bryson, 888 F.2d at 1565). Because "[a]n employee's speech will rarely be entirely private or entirely public," the "main thrust" of the employee's speech must be determined. Morgan v. Ford, 6 F.3d 750, 755 (11th Cir. 1993).

The Eleventh Circuit has held where a plaintiff does not address her concerns to the public or in a public forum, the speech is generally not protected, barring extraordinary circumstances. See Morgan, 6 F.3d at 755. Here, Plaintiff related her concerns to officials but not to the public. While Plaintiff spoke out on many occasions about the unfair hiring process, these occasions did not involve the public. In fact, Plaintiff never addressed any of her complaints to the Board of Education during any public comment sessions for citizens. Rather, Plaintiff spoke about her personal grievances privately to her co-workers, Board members, and GAE representatives on an individual basis. (See generally Pl.'s Dep. at 240-79.)

With regard to the content of her speech, Plaintiff did complain that unqualified and uncertified persons were being appointed to positions in the school district. Notably, the public may be interested in the fair and honest implementation of the Board's hiring practices. In fact, the Court acknowledges that having qualified teachers in administrative positions within our public schools is a matter of important

public interest. However, as the Eleventh Circuit has explained, this fact, standing alone, is not the determinative factor of the public concern element. Morgan, 6 F.3d at 754 (citing Kurtz v. Vickrey, 855 F.2d 723, 727 (11th Cir. 1988)). The Eleventh Circuit emphasized that the relevant inquiry is "whether the purpose of [the plaintiff's] speech was to raise issues of public concern . . . . or to further her own private interest." Id.

Here, Plaintiff voiced her concerns as a disgruntled employee rather than as a citizen concerned about corruption. (See Pl.'s Dep. at 240-79.) Indeed, the purpose of Plaintiff's speech was to support her cause for a promotion. (See, e.g., id., Ex. 14.) In fact, Plaintiff admits that she never complained to anyone that qualified employees, other than herself, were being overlooked for promotions in the school system. (See Pl.'s Resp. to Defs.' St. of Mat. Facts, ¶¶ 57-59.) Ultimately, Plaintiff's speech was driven by her own private self-interest in improving her position of employment.

Finally, with respect to Plaintiff's PSC complaint, the Court notes that such complaint was made pursuant to her duties as an educator. Plaintiff testified that in March of 2004, she made a report to the Georgia PSC that Larke violated Standard 4 of the Code of Ethics for Educators.[12] Compliance with the

---

[12] Standard 4 requires an educator who is certified by the PSC to exemplify ethical conduct. Ga. Prof. Stand. Comm'n, § 505-6-01(2)(b) and (3)(d).

AO 72A
(Rev. 8/82)

Code of Ethics is mandatory for all certified Georgia educators.[13] O.C.G.A. § 20-2-984.1(b). Therefore, if Plaintiff believed Larke and the Board were engaged in hiring practices which violated the Code of Ethics, then, as a certified Georgia educator, she had an affirmative duty to report such conduct. Thus, Plaintiff's report to the PSC constituted speech as a Georgia educator and not as a citizen. Thus, such speech is not protected by the First Amendment. See Garcetti, 126 S.Ct. at 1960 (holding broadly "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.").

In conclusion, because the main thrust of Plaintiff's speech was not as a citizen but instead primarily as an employee upon matters of personal interest, Plaintiff's speech is not protected by the First Amendment. Thus, summary judgment is appropriate on Plaintiff's free speech claim. Accordingly, Plaintiff's free speech claims are **DISMISSED**.

D. Free Association

Plaintiff's remaining First Amendment claim alleges that

---

[13] Plaintiff contends that she was not required by the Code of Ethics to report any breach of ethical rules. Plaintiff's interpretation is erroneous. The Code of Ethics states:

[E]ducators are required to report a breach of one or more of the Standards of the Code of Ethics for Educators, as soon as possible, but no later than ninety days (90) from the date the educator became aware of the alleged breach.

Ga. Prof. Stand. Comm'n, § 505-6-.01(4)(a).

Defendants violated her right to free association when they failed to promote her because she spoke out. (Compl. ¶ 23.) As with other First Amendment rights, public employees have the right to engage in associative activities without fear of retaliation. See, eg., Cook v. Gwinnett County School Dist., 414 F.3d 1313, 1320 (11th Cir. 2005).

There are two different forms of association, intimate association and expressive association. McCabe v. Sherrett, 12 F.3d 1558, 1562-63 (11th Cir. 1994)(internal quotations omitted). Intimate association encompasses marriage and can extend to other relationships which share the qualities distinctive to family relationships, such as relative smallness and seclusion from others in critical aspects of the relationship. Id. at 1563. The right of expressive association is the freedom to associate for the purpose of First Amendment conduct. Id. In other words, Plaintiff's activity is protected if the purpose of the association is to engage in activities independently protected by the First Amendment. Id.

In the instant case, Plaintiff's claim is best classified as relating to her constitutional right to expressive association. In this context, Eleventh Circuit precedent has long held that associational activity by public employees need not be on matters of public concern to be protected under the First Amendment. See, e.g., Hatcher v. Bd. of Pub. Educ. & Orphanage, 809 F.2d 1546, 1558 (11th Cir. 1987); Cook v. Gwinnett County Sch. Dist., 414 F.3d 1313, 1320 (11th Cir.

AO 72A
(Rev. 8/82)

2005) (citing <u>Hatcher</u>). However, recently in <u>D'Angelo v. School</u> <u>Bd. of Polk County, Fla.</u>, --- F.3d ----, 2007 WL 2189099 (11th Cir. August 1, 2007), the Eleventh Circuit clarified its position in light of the Supreme Court's ruling in <u>Garcetti v.</u> <u>Ceballos</u>, 547 U.S. __, 126 S.Ct. 1951 (2006). As the Supreme Court discussed in <u>Garcetti</u>, "[g]overnment employers . . . need a significant degree of control over their employees' words and actions," including the associational activity of public employees as employees. <u>Id.</u> at 1958. Restricting associational activity that is not undertaken as a citizen, but "that owes its existence to a public employee's professional responsibilities[,] . . . . simply reflects the exercise of employer control over what the employer itself has commissioned or created." <u>Id.</u> at 1960. Relying on this precedent, the Eleventh Circuit determined that only associational activity by public employees undertaken *as citizens* is protected under the First Amendment. <u>See D'Angelo</u>, 2007 WL at 8-9. Here, as with her free speech claim, Plaintiff's conversations with Board members were not undertaken as a citizen. Rather, Plaintiff's associational activities with Board members, GAE representatives, and her co-workers were as a disgruntled employee. Similarly, Plaintiff's associational activity with the PSC was pursuant to her professional duties. Thus, upon consideration of <u>Garcetti</u> and <u>D'Angelo</u>, Plaintiff's associational activity is not protected. Accordingly, Plaintiff's free association claim fails as a matter of law.

AO 72A
(Rev. 8/82)

E. Equal Protection

Plaintiff also brings this § 1983 action based on an alleged violation of the Equal Protection Clause of the Fourteenth Amendment. More specifically, Plaintiff alleges that because she rejected Larke's sexual overtures, he did not recommend her for promotion.[14] Sexual harassment claims brought pursuant to § 1983 are analyzed under the same analytical framework as sexual harassment claims brought pursuant to Title VII of the Civil Rights Act of 1964. Mitchell v. Pope, 189 Fed. Appx. 911 (11th Cir. 2006)(citing Hardin v. Stynchcomb, 691 F.2d 1364 (11th Cir. 1982)).

To establish sexual harassment under Title VII, an employee must prove (1) she belongs to a protected group; (2) she has been subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) that a basis for holding the employer liable exists. Hulsey v. Pride Rests., LLC, 367 F.3d 1238, 1244 (11th Cir. 2004).

To prove sexual harassment in violation of Title VII, a plaintiff may rely on one of two theories. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753-54 (1998). Under the first theory, commonly referred to as *quid pro quo*, the plaintiff must prove that the harassment culminated in a

---

[14]   Plaintiff does not allege or contend that Larke made any overtures of a sexual or romantic nature to her at any time before or after the November 2000 Jamaica trip. (Pl.'s Dep. at 36-37.)

"tangible employment action" against her. Under the second or "hostile work environment" theory, the plaintiff must prove that she suffered "severe or pervasive conduct."[15] <u>Id.</u> at 754.

Because Larke's statements do not rise to the level of "severe or pervasive conduct," the Court must determine whether Plaintiff presented evidence that Defendants took a "tangible employment action" against her. As defined by the Supreme Court, a tangible employment action is "a significant hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." <u>Id.</u> at 761. Here, Plaintiff claims that she was passed over for promotions because she refused Larke's sexual overtures. (Pl.'s Brief Opposing Defs.' Mot. for Summ. J. at 19.) Notably, Plaintiff must prove more than she was simply not promoted; Plaintiff must prove that her inability to receive a promotion was causally related to the incident of harassment. <u>See</u> <u>Frederick v. Sprint/United Mgmt. Co.</u>, 246 F.3d 1305, 1312 (11th Cir. 2001); <u>see also</u> <u>Burlington Indus.</u>, 524 U.S. at 753-54.

---

[15] Here, Larke's conduct does not rise to the level of severe or pervasive. As recognized by the 11th Circuit in <u>Gupta v. Florida Bd. of Regents</u>, 212 F. 3d 571, 584 (11th Cir. 2000):

> [It] is debatable whether such a compliment (["You are looking very beautiful"]) is sexual in nature, but assuming it is, we do not believe that a reasonable person would deem it to be offensive. A man can compliment a woman's looks (or a woman compliment a man's looks) on one or several occasions by telling her that she is looking "very beautiful," or words to that effect without fear of being found guilty of sexual harassment for having done so.

AO 72A
(Rev. 8/82)

As a threshold matter, a *quid pro quo* sexual harassment claim generally requires some communication or demand from the sexual harasser. See Hulsey, 367 F.3d at 1245 ("[Quid pro quo sexual harassment occurs] if the employee's refusal to submit to a supervisor's sexual demands results in a tangible employment action."). Here, it is unclear whether Larke's words rise to the level of an explicit *quid pro quo* demand.[16]

Assuming *arguendo* that there was an implicit *quid pro quo* demand, Plaintiff nevertheless fails to establish any causal link between her inability to receive a promotion and the alleged harassment. Plaintiff's entire theory that she did not receive promotions because she refused Larke's romantic overtures is built upon the alleged double hearsay statements of a third party, Horace Lamback. (Pl.'s Dep. at 21-22.) Lamback denies making the statement. (Aff. of Lamback, ¶ 13.) Moreover, inadmissible hearsay cannot defeat a summary judgment motion. See Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999) (stating that a court cannot consider inadmissible hearsay evidence in opposition to a summary judgment motion).

It is also worth noting that Plaintiff has failed to set forth evidence that she was the most qualified candidate for

---

[16] Of note, the Eleventh Circuit has established that a victim need not provide evidence of a direct and express sexual demand to make a claim under the "tangible employment action" analysis. See, e.g., Llampallas v. Mini-Circuits Lab., Inc., 163 F.3d 1236, 1246 (11th Cir. 1998) (explaining that one can establish a tangible employment action claim with less than direct statements which allow "inferences [to be] drawn from the observable facts").

AO 72A
(Rev. 8/82)

any promotion. Indeed, each time Plaintiff was passed over for promotion, she never ranked higher than the successful candidate. Although Plaintiff alleges her rankings were prejudiced, she failed to bring forward admissible evidence to that effect. Moreover, Plaintiff has not set forth any facts in her pleadings that effectively measure her objective job-related skills, education, experience, and job performance against which to measure her allegations of prejudice. In short, Plaintiff has simply failed to point to any specific evidence linking her rejection of Larke's sexual overtures to any of the alleged discrimination by Defendants. Accordingly, the Court grants summary judgment on Plaintiff's equal protection claim.

## F. Due Process

In her complaint, Plaintiff initially asserted that her First Amendment claims evince a violation of her due process rights. Plaintiff has neither briefed this claim (see doc. no. 29) nor asserted this claim in the Consolidated Pretrial Order. (See doc. no. 43 at 4; see also Local Rule 16.4 ("[T]he pretrial order shall supersede all prior pleadings . . .") Consequently, the Court could deem Plaintiff's due process claim abandoned. However, out of an abundance of caution, the Court addresses Plaintiff's due process claim herein.

First, Plaintiff had no substantive due process interest in her employment. "Because employment rights are state-created

AO 72A
(Rev. 8/82)

rights and are not fundamental rights created by the Constitution, they do not enjoy substantive due process protection." Silva v. Bieluch, 351 F.3d 1045, 1047 (11th Cir. 2003)(quoting McKinney v. Pate, 20 F.3d 1550, 1560 (11th Cir. 1994)). Plaintiff points out no basis upon which to deviate from this general rule.

Second, a person is not entitled to procedural due process unless she is deprived of an interest in life, liberty, or property. Bd. of Curators, Univ. of Mo. v. Horowitz, 435 U.S. 78, 84 (1978). There are two questions in the analysis of a procedural due process claim. Did the plaintiff have a property interest of which she was deprived by state action? If so, did the plaintiff receive sufficient process regarding that deprivation? See Ross v. Clayton County, 173 F.3d 1305, 1307 (11th Cir. 1999)

Under this framework, the threshold question is whether Plaintiff was deprived of a protected property or liberty interest. See, e.g., Faucher v. Rodziewicz, 891 F.2d 864, 869 (11th Cir. 1990). The Eleventh Circuit has held that a prospective promotion is not a property or liberty interest protected by the Fourteenth Amendment. See Doyle v. University of Alabama in Birmingham, 680 F.2d 1323, 1326 (11th Cir. 1982) ("no protected property interest in the mere recommendation for

29

a raise"). In sum, Plaintiff's due process claims fail as a matter of law.

### IV. CONCLUSION

Upon the foregoing, Defendants' motion for summary judgment (doc. no. 18) is **GRANTED.** Plaintiff's state law claims are **DISMISSED WITHOUT PREJUDICE**. The Clerk is directed to **CLOSE** this case and **ENTER FINAL JUDGMENT** in favor of Defendants on all Federal claims.

**ORDER ENTERED** at Augusta, Georgia, this _22_ day of August, 2007.

HONORABLE LISA GODBEY WOOD
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev. 8/82)